2011 Ark. App. 735

**Sandra FOSTER, Appellant**

v.

**GILSTER MARY LEE CORPORA-TION and Gallagher Bassett Services, Appellees.**

**No. CA 11–355.**

Court of Appeals of Arkansas.

Nov. 30, 2011.

Richard Alfred Reid, Blytheville, for appellant.

William Charles Frye, North Little Rock, for appellee.

DOUG MARTIN, Judge.

Appellant Sandra Foster appeals from that portion of the Arkansas Workers' Compensation Commission's opinion finding her entitled to a 30% wage-loss disability. Appellee Gilster Mary Lee Corp. ("Gilster") cross-appeals from the part of the Commission's decision finding that Gilster did not make a bona fide offer of employment to Foster. We find no error and affirm on both direct and cross-appeal.

Foster attended school only through the fifth grade and worked at manual-labor jobs most of her life. She began working for Gilster in 2002 and sustained an admittedly compensable injury to her cervical spine on January 23, 2006. In March 2006, Foster saw Dr. Robert Abraham, a neurosurgeon in Jonesboro. Prior to visiting Dr. Abraham, Foster underwent an MRI, which revealed a herniated nucleus pulposus at C5–C6. Dr. Abraham recommended surgery and performed an anterior cervical diskectomy with fusion at C5–C6 in March 2006. At a follow-up visit in April 2006, Foster was still having frequent muscle spasms and some right up-

per-extremity pain, but her symptoms were better than before the surgery. Dr. Abraham directed Foster to engage in physical therapy and released her to return to work on May 15, 2006, with restrictions on lifting anything more than twenty-five pounds.

On July 24, 2006, Foster underwent a nerve conduction study that showed she had "minor denervation/reinnervations at the C5–C6 muscle, and that was the only finding," according to Dr. Abraham. Dr. Abraham explained that this meant that Foster had some difficulties with the nerves in that area but was improving. By the time of Foster's August 15, 2006 follow-up visit, her muscle spasms were gone and she had minimal tenderness, so Dr. Abraham approved her for light-duty work. Foster returned to work in August 2006.

Foster saw Dr. Abraham again in January 2007. At that time, Dr. Abraham noted some tenderness in Foster's neck, which was "about the extent of her problems," and released her to work with "lifting restrictions of twenty pounds, limited use of both of her hands, mainly on the right side, [and] no work over shoulder height." Dr. Abraham ordered another MRI in January 2007 and saw Foster for a follow-up visit in February 2007. At that time, Foster had no other herniations and very minimal disk bulges at adjacent levels. When Foster saw Dr. Abraham in April 2007, she had some muscle spasms, but her neurological exam was stable. Because Foster was experiencing ongoing "difficulties," Dr. Abraham ordered another nerve conduction study, but the test showed that Foster was stable and doing better than she was at the time of the previous study.

Foster was also seen by Dr. Fereidoon Parsioon in July 2007. After examining Foster, Dr. Parsioon opined that her surgical results were excellent, her fusion was complete, and her pain was mostly due to a "muscular-type pain [that] she needs to overcome with continuation of the exercises." Dr. Parsioon concluded that Foster was at her maximum medical improvement with a 12% impairment rating and could be released to work without restrictions.

By November 2007, Foster was working within her limitations and was able to do her job, although she experienced some right-arm pain and numbness. A note from Dr. Abraham dated November 8, 2007, indicated that Foster was not to do any overhead work and not to lift anything over thirty pounds.

Foster continued to be treated by Dr. Abraham, seeing him in July and August 2008. In July, Foster reported pain in her neck that radiated into both shoulders and arms, as well as numbness in her right hand and arm. At the time of the August 2008 visit, however, Foster's physical exam was benign, and Dr. Abraham reported that she was "doing fairly well from an objective standpoint," and he later testified that there "would have been no reason she could not have worked other than the fact that when she worked she has difficulties" with pain. Nonetheless, Dr. Abraham took Foster off work "indefinitely" as of August 18, 2008, because of those problems, and Foster did not work after that time. Foster and Gilster stipulated that her healing period ended on November 18, 2008, with a residual 12% whole-body anatomical impairment.

In July 2009, Foster began working with Heather Taylor, a vocational rehabilitation consultant, who recommended a functional capacity evaluation (FCE). Foster completed her FCE on October 19, 2009, and the results of the test showed that Foster's functional limitations were as follows:

Ms. Foster demonstrates functional limitations with bi-manual material handling at 15 lbs. for lifting and carrying on an Occasional basis. Ms. Foster exhibits decreased use of the [right upper extremity] as compared to an average worker and performed Reaching Overhead and Reaching with a 1 lb. weight at the Occasional frequency level only. Ms. Foster exhibits limited [active range of motion] of the cervical region and performed all activities that required cervical deviation from neutral with poor tolerance.

The FCE's conclusions noted that Foster "demonstrated the ability to perform work in the SEDENTARY classification as defined by the U.S. Dept. of Labor's guidelines over the course of a normal workday with limitations as noted above." The "sedentary" classification of work includes occasional lifting of one to ten pounds up to 33% of the workday.

Taylor contacted Gilster about whether Gilster had any jobs that Foster could perform. Gilster, a private-label food packager, suggested that the job duties of a "sugar-free gelatin packer" would be within Foster's capabilities and restrictions. Taylor made a videotape of an employee performing the job and completed a job analysis, and she determined that it appeared that the gelatin-packer job was within the restrictions outlined on Foster's FCE.

At the hearing before the ALJ, however, Foster testified that the gelatin-packer job was "very fast, and you have to reach with your arms, and the lines are fast." She expressed a belief that the job was not one that she could perform because it required repetitive use of her arms and picking up cartons. Foster's friend and co-worker, Suzanne Alma, also testified that she did not believe Foster could perform the gelatin-packer job, noting that the job involved

gathering up cartons from a conveyor belt and pushing the cartons through a tape machine. Alma said there were twenty-four cartons to a case, and there are hundreds of cases per shift. Alma explained that, to do the job, one must use one's hands and arms repetitively, and Alma said that she did not believe that Foster could use her arms repetitively in such a manner. After hearing the testimony noted above, Taylor said that, even though the job analysis appeared to be within Foster's restrictions, she did not know whether Foster could actually perform the job duties.

On the basis of this evidence, the ALJ entered an opinion on August 12, 2010, finding that Foster had a 12% anatomical impairment to the body as a whole as a result of her compensable injury. In addition, based on Foster's "age, education, employment history, permanent physical restrictions and limitations, and other matters reasonably expected to affect [Foster's] future earning capacity ..., the evidence preponderates that [Foster] has sustained a loss of earning capacity in the amount of 70% over and above, and in addition to, her anatomical impairment."

Gilster appealed the ALJ's decision to the full Commission, and in a 2–1 vote, the Commission affirmed the decision to award Foster wage-loss benefits. In doing so, the Commission found that Gilster failed to prove that it provided Foster with a bona fide offer of employment within Foster's physical restrictions. The Commission further found that Foster was motivated to return to work but was rendered physically unable to perform full-time[6] manual labor in a factory setting as a result of her compensable injury, surgery, and anatomical impairment. The Commission, however, modified the ALJ's award of a 70% wage-loss disability, finding instead that

Foster had proved she sustained wage-loss disability in the amount of 30%.

Foster appeals the Commission's reduction of her wage-loss disability from 70% to 30%. Gilster cross-appeals from the Commission's finding that Gilster did not provide Foster with a bona fide offer of employment within her physical restrictions.

The injured party bears the burden of proof in establishing entitlement to benefits under the Worker's Compensation Act and must sustain that burden by a preponderance of the evidence. *Dearman v. Deltic Timber Corp.*, 2010 Ark.App. 87, 377 S.W.3d 301. It is within the Commission's province to reconcile conflicting evidence and to determine the true facts. *Stone v. Dollar Gen. Stores*, 91 Ark.App. 260, 209 S.W.3d 445 (2005). The Commission is not required to believe the testimony of the claimant or any other witness but may accept and translate into findings of fact only those portions of the testimony that it deems worthy of belief. *Neal v. Sparks Reg'l Med. Ctr.*, 104 Ark.App. 97, 102, 289 S.W.3d 163, 167 (2008). The evidence is viewed in the light most favorable to the Commission's decision, and the decision will be affirmed when it is supported by substantial evidence. *Ester v. Nat'l Home Ctrs., Inc.*, 335 Ark. 356, 981 S.W.2d 91 (1998). Substantial evidence exists if fair-minded persons could reach the same conclusion when considering the same facts. *Id.* Where the Commission denies benefits because the claimant has failed to meet his burden of proof, the substantial-evidence standard of review requires that we affirm if the Commission's decision displays a substantial basis for the denial of relief. *Frances v. Gaylord Container Corp.*, 341 Ark. 527, 20 S.W.3d 280 (2000).

In her sole argument on appeal, Foster argues that the Commission's reduction of her wage-loss benefit from the 70% awarded by the ALJ to 30% was not supported by substantial evidence and that there is nothing in the record to show why the reduction occurred. Further, Foster maintains that the ALJ had the opportunity to observe and view the witnesses, and she asserts that "the person who has the opportunity to observe witnesses as opposed to reading what they said is in a much better position to determine their truthfulness as they testify."

Our review on appeal, however, is not directed to a comparison of the ALJ's decision to the Commission's decision. It is well settled that the Commission reviews an ALJ's decision de novo, and it is the duty of the Commission to conduct its own fact-finding independent of that done by the ALJ. *Daniels v. Affiliated Foods Sw.*, 70 Ark.App. 319, 324, 17 S.W.3d 817, 820 (2000) (citing *Crawford v. Pace*, 55 Ark.App. 60, 929 S.W.2d 727 (1996)). The appellate courts review the decision of the Commission and not that of the ALJ. *Id.* (citing *High Capacity Prods. v. Moore*, 61 Ark.App. 1, 962 S.W.2d 831 (1998)). Thus, this court's role is limited to determining whether substantial evidence supports the Commission's award of a 30% wage-loss benefit.

The wage-loss factor is the extent to which a compensable injury has affected the claimant's ability to earn a livelihood. *Henson v. Gen. Elec.*, 99 Ark. App. 129, 257 S.W.3d 908 (2007); *Emerson Elec. v. Gaston*, 75 Ark.App. 232, 58 S.W.3d 848 (2001). The Commission is charged with the duty of determining disability based upon a consideration of medical evidence and other matters affecting wage loss, such as the claimant's age, education, and work experience. *Henson, supra.* Objective and measurable physical or mental findings, which are necessary to support a determination of "physical im-

pairment" or anatomical disability, are not necessary to support a determination of wage-loss disability. *Id.*; *Arkansas Methodist Hosp. v. Adams*, 43 Ark.App. 1, 858 S.W.2d 125 (1993). To be entitled to any wage-loss-disability benefit in excess of permanent-physical impairment, a claimant must first prove, by a preponderance of the evidence, that he or she sustained permanent-physical impairment as a result of a compensable injury. *Wal–Mart Stores, Inc. v. Connell*, 340 Ark. 475, 10 S.W.3d 882 (2000). Other matters to be considered are motivation, post-injury income, credibility, demeanor, and a multitude of other factors. *Glass v. Edens*, 233 Ark. 786, 346 S.W.2d 685 (1961); *Curry v. Franklin Elec.*, 32 Ark.App. 168, 798 S.W.2d 130 (1990). The Commission may use its own superior knowledge of industrial demands, limitations, and requirements in conjunction with the evidence to determine wage-loss disability. *Henson, supra;* *Oller v. Champion Parts Rebuilders, Inc.*, 5 Ark.App. 307, 635 S.W.2d 276 (1982).

Here, the Commission specifically noted Foster's age, her relative lack of formal education, and her work history that involved "mostly unskilled manual labor." The Commission also found that Foster's physical capacity to perform manual labor had decreased as a result of her compensable injury and resulting surgery. In addition, the Commission concluded that Foster was motivated to return to work but was "rendered physically unable to perform full-time manual labor in a factory setting" as a result of her injury. Despite Foster's arguments to the contrary, the issue before this court is not whether the Commission erred in reducing Foster's 70% wage-loss award to 30%, but whether substantial evidence exists to support the Commission's award of a 30% wage-loss benefit. Given the evidence set forth above, we conclude that the Commission's decision is supported by substantial evidence.

On cross-appeal, Gilster argues that the Commission erred in finding that it did not make a bona fide offer of employment to Foster. Arkansas Code Annotated section 11–9–522(b), which governs permanent-partial disability benefits and wage-loss disability, provides in pertinent part as follows:

(2) [S]o long as an employee, subsequent to his or her injury, has returned to work, has obtained other employment, or has a bona fide and reasonably obtainable offer to be employed at wages equal to or greater than his or her average weekly wage at the time of the accident, he or she shall not be entitled to permanent partial disability benefits in excess of the percentage of permanent physical impairment established by a preponderance of the medical testimony and evidence.

Ark.Code Ann. § 11–9–522(b)(2) (Repl. 2002). The employer has the burden of proving a bona fide offer of employment. Ark.Code Ann. § 11–9–522(c)(1) (Repl. 2002); *Sivixay v. Danaher Tool Group,* 2009 Ark.App. 786, 359 S.W.3d 433.

Here, Foster's functional capacity evaluation indicated that she was capable of working in a sedentary capacity over the course of a normal workday. According to the FCE, which was not disputed, the United States Department of Labor's guidelines described the physical demands of a job classified as sedentary as requiring no more than occasional (0–33% of the workday) handling of one to ten pounds. The job analysis conducted by Heather Taylor, however, indicated that the physical-demand classification for the "sugar-free gelatin packer" position that Gilster offered to Foster was "light," which required "exerting 20 [pounds] of force occasionally, or up to 10 [pounds] frequently,

or a negligible amount constantly." The only way the job could be modified, according to the job analysis, would be for the worker to work eight hours per day five days per week, rather than ten-hour shifts six days per week.

Foster testified that she could not physically perform the job duties of the gelatin-packer position, and her testimony was corroborated by Suzanne Alma, who stated that she had observed Foster since she was injured and did not believe that Foster could do the job. In addition, Taylor testified that, after hearing Foster's description of her difficulties, she did not know whether Foster could do the job.

Gilster argues on cross-appeal that there was evidence showing that Foster *could* perform the job duties of the gelatin-packer position. For example, it notes a document from Rick Byrd, who performed the FCE, in which Byrd states that, when comparing the physical demands of the position with Foster's physical performance level during her FCE, Foster met all of the physical demands as described in this written job description. Gilster also points to the deposition testimony of Dr. Abraham, who indicated that he "wouldn't have any problem with someone else saying" that Foster could go back to work.

In finding that Gilster had not made a bona fide offer of employment to Foster, however, the Commission specifically noted that the "job analysis describes the gelatin packer position as 'light' duty, but we reiterate the results of the functional capacity evaluation showing the claimant physically able to perform only 'sedentary' work duties." The evidence to which Gilster points does nothing more than attempt to raise a question concerning the credibility of the witnesses, which is an issue within the exclusive province of the Commission. *See Belin v. United Parcel Serv.*, 2011 Ark.App. 587, 2011 WL 4584940 (it is the function of the Commission, not this court, to determine the credibility of witnesses and the weight to be given to the evidence). Thus, given the evidence described above, we conclude that the Commission's decision was supported by substantial evidence.

Affirmed on direct appeal; affirmed on cross-appeal.

HART and GLOVER, JJ., agree.